NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                 :

DOROTHY GRIMES,               :          Civil Action No.: 09-419 (FLW)
                                 :

            Plaintiff,      :

                                 :             Opinion

      v.                 :

                                 :

PRUDENTIAL FINANCIAL, INC.,   :

                                 :

           Defendant.    :
_____ :

WOLFSON, United States District Judge:

      Presently before the Court are two separate Motions for Summary Judgment filed by Plaintiff Dorothy Grimes ("Grimes") and Defendant, The Prudential Insurance Company of America, improperly pled as Prudential Financial, Inc. ("Prudential").  Grimes alleges that Prudential wrongfully denied her benefits pursuant to the Long Term Disability Plan ("the Plan") administered by Prudential on behalf of her employer, in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001(a)(1)(B), et seq. ("ERISA").  Defendant, conversely, argues that its decision is supported by the record and moves, additionally, to dismiss Plaintiff's New Jersey Consumer Fraud Act claim as preempted by ERISA.  For the reasons that follow, the Court denies Defendant's motion for summary judgment as to Plaintiff's ERISA claim,

but grants it as to Plaintiff's New Jersey Consumer Fraud Act claim.  Plaintiff's motion for summary judgment is granted to the extent that the Court remands this case for further administrative review.

## I.      BACKGROUND

The Court notes, at the outset, that Defendant moves to strike Plaintiff's Affidavit attached to her motion for summary judgment.[1]  Under Third Circuit case law, only those facts before the administrator, at the time the benefits decision was made, may be considered by the Court on summary judgment.  See Kosiba v. Merck & Co., 384 F.3d 58, 69 (3d Cir. 2004); Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997).  There are a few limited exceptions to this rule. See e.g., Otto v. Western Pennsylvania Teamsters and Employers Pension Fund, 127 Fed. Appx. 17, 21 n.7 (3d Cir. 2005) ("Evidence beyond the administrative record may in certain circumstances be relevant and admissible as to issues that were not before the plan administrator—such as trustee conflict of interest, bias, or a pattern of inconsistent benefits decisions.");  Gardner v. Unum Life Ins. Co., 2009 WL 4457515, *5 n. 4 (3d Cir. Dec.4, 2009) ("[C]harges of fraud or mistake in the [administrative] record are subject to scrutiny.").  However, Plaintiff has not argued that any of these exceptions are applicable here.  For this reason, I will not consider Plaintiff's Affidavit in connection with her cross-motion or Defendant's motion for summary judgment and I do not rely upon the affidavit in recounting the facts here.

In 1993, Plaintiff Grimes began working as a Policy Support Specialist for Horizon Blue Cross Shield of New Jersey ("Horizon").  Def. Statement of Material Facts ("SOMF"), ¶ 18; Pl.

---

[1]      While Defendant did not formally file a motion to strike, I so construe its argument that Plaintiff's Affidavit may not properly be considered in connection with the instant motion.

Resp. to Def.  SOMF, ¶ 18.  Horizon contracted with Prudential to provide long term disability insurance for its employees.  Palmer Afft., Exh. A, Horizon Blue Cross Blue Shield of New Jersey ("LTD Plan") at 1.  This long term disability insurance plan is an "employee benefit welfare plan" subject to regulation under ERISA.  Def.  Open.  Br.  at 3.  Prudential is both the insurer and the administrator of the Plan.  LTD Plan at 40.

A.    Overview of the Plan

Those determined to be disabled under the Plan are entitled to a monthly long term disability ("LTD") benefit of 60% of their monthly earnings, up to $12,500.  LTD Plan at 1.  An employee is disabled when she is "unable to perform the material and substantial duties of [her] regular occupation" due to sickness or injury.[2]  Id. at 10.  "Material and substantial duties" are defined as those duties "normally required for the performance of [the employee's] regular occupation."[3]  Id.; id. at 34.  After twenty-four months of payments, the definition of disability changes such that an employee must be "unable to perform the duties of any gainful occupation for which [the employee is] reasonably fitted by education, training, or experience."  Id. at 10.

---

[2]    The Plan also requires employees to "have a 20% or more loss in your indexed monthly earnings due to that sickness or injury."  Id. That Grimes satisfied this element is not disputed.

[3]    The second element of the material and substantial duties definition—that the duties "cannot be reasonably omitted or modified, except that if [the employee is] required to work on average in excess of 40 hours per week, Prudential will consider [the employee] able to perform that requirement if [the employee] is working or [has] the capacity to work 40 hours per week"—is also not at issue in this case.  Id.

3

Prudential, as administrator of the Plan, has "the sole discretion to interpret the terms of the [the Plan], to make factual findings, and to determine eligibility for benefits." Id. at 40.  If Prudential determines that an employee is ineligible, the employee may appeal in writing within 180 days of the adverse determination.  Id. at 41.  The employee may submit "any written comments, documents, records or any other information" along with the appeal.  Id.  And, upon request, the employee is entitled to receive copies of "all documents, records and information relevant to [her claim for benefits] free of charge."  Id.  On appeal, Prudential will not afford any deference to the initial denial of benefits.  Id.  Rather, it will conduct "[a] full review of the information in the claim file and any new information submitted to support the appeal ...."  Id.  If the appeal is denied, the employee may appeal a second time, if desired, or institute a civil suit under ERISA.  Id.

B.    Beginning of Grimes' Medical Difficulties

Sometime prior to 2006, Grimes began experiencing severe neck pain, numbness in her limbs, dizziness, and related symptoms.  See Dr. Foye's Report, PRU 000071.  She consulted with her primary care physician and he determined that the disks in her neck were pressing against her spinal cord.  He recommended her for immediate surgery.  Id.

Plaintiff was then seen by Dr.  Michael Nosko, a neurosurgeon.  Nosko Letter dated August 25, 2006, PRU 000210.  After reviewing a MRI which "show[ed] a sizeable disk herniation at C5-C6 and a lesser one at C4-C5 with significant stenosis at [those] two levels," he recommended

a "2-level anterior diskectomy and fusion with cages and plates." Id.  Grimes was 56-years old at the time of Nosko's recommendation.  Id.

Shortly after Nosko's recommendation, Grimes underwent a C4-5 and C5-6 anterior cervical diskectomy and fusion surgery on September 13, 2006.  Def.  SOMF at ¶ 27; Pl.  Resp. Def.  SOMF at ¶ 27.  The day after the surgery, September 14, 2006, Dr. Nosko completed an Attending Physician's Statement of Disability.[4]   Nosko Attending Physician Statement, PRU 000197.  In this statement, Dr.  Nosko noted that Grimes would be unable to work for two to three months.  See id.

A week following the surgery, Nosko notes that Grimes reported "a lot of discomfort, particularly at night, but by and large feels that the pain and numbness in her hand has resolved." Nosko Office Note dated 09/26/09, PRU000212.  He prescribed physical therapy.  Id.  In a subsequent visit on November 17, 2006, Nosko noted that Grimes continued to complain of great neck discomfort, particularly at night.  Def.  SOMF at ¶ 30; Pl.  Resp.  to Def.  SOMF.  at ¶ 30. Nosko remained optimistic, however, that Grimes would improve.  Id.  He noted that she had not been taking much pain medication "other than some Motrin," and then prescribed her Tylenol and Codeine, along with other medications.  Nosko Office Note dated November 17, 2006, PRU 000213.  He, further, directed her to continue physical therapy.  Id.

---

[4]    The Court reads the denoted date of "6.14.06" on the statement as a typographical error in light of the statement's note elsewhere that "surgery done yesterday."  Because the surgery was completed on September 13, 2006, Dr. Nosko apparently inverted the "6" for a "9".  Thus, there is no record support for Plaintiff's Response to Defendant's SOMF at ¶ 33, in which Plaintiff states that "Dr. Nosko's statement was prepared on June 14, 2006, several months before the actual surgery was performed and only provided an approximation."

C.        Prudential's Initial Denial of LTD Benefits

On January 3, 2007, Plaintiff submitted an LTD benefits application to Prudential.[5]  She supplied the September 14, 2006 Attending Physician Statement from Dr. Nosko, in support of her application.  See Prudential Letter dated January 8, 2007, PRU 000403-04.  Finding this statement, alone, insufficient to substantiate her claim, Prudential requested copies of "all medical records from September 1, 2006 to the present."  Id.  Prudential also requested proof that she was under the regular care of a doctor.  Id.  Plaintiff subsequently submitted medical records from Dr. Nosko.  See Prudential Letter dated February 27, 2007, PRU 000400-01 ("Prudential Initial Denial") (indicating that records through February 7, 2007 received from Dr. Nosko).

While her application was pending, Grimes saw Dr. Nosko again on February 7, 2007. According to his notes on that date, Grimes complained that she "was still feeling very poorly" and was experiencing continued "numbness in the hand and feet . . . just the toes and just the fingers." Nosko Office Note dated 02/07/2007, PRU 000202.  Per his re-examination, he concluded that her "reflexes [were] physiologic and symmetric," and her "hardware was in tact."  Id.  He noted that X-rays revealed adhesive calcific tendinitis in her shoulder and calcific tendinitis in the

_____

[5]        Defendant notes in its Statement of Material Facts that, according to Plaintiff's Complaint, she applied for and was granted short-term disability benefits prior to this date.  Def. SOMF at ¶ 31 (citing Compl., ¶ 15).  In her brief, however, she has not pointed to specific record evidence to substantiate this factual assertion.  That said, Dr. Nosko's September 14, 2006 Attending Physician Statement is stamped "DMS Unit, September 18, 2006, Received," which suggests that some unidentified body received a copy of the statement around the time that Plaintiff asserts she applied for short-term disability benefits.

ligament.  Id.  To "ensure that everything [wa]s clear," Dr. Nosko sent Grimes for a "followup" MRI of her cervical spine.  Id.  Dr. Nosko did not, at that time, suggest further treatment.

Based on review of Dr. Nosko's statement and treatment records, Prudential denied Grimes' application on February 27, 2007.  Def. SOMF at ¶ 34; Pl. Resp. to Def. SOMF at ¶ 34. Prudential concluded that Grimes was not disabled under the Plan, citing "inconsistencies" in Grimes' medical records.  Prudential Initial Denial at 2.  In Prudential's view, it expected a twelve-week recovery period, whereas Grimes, at the time of her LTD application, was already five months post-surgery.  Id.  Prudential did not cite to any basis for its conclusion that a twelve-week recovery period was typical.

Prudential, further, relied on Nosko's February 7th treatment notes to conclude that there were no objective medial findings to support Grimes' subjective complaints of pain.  Id. In reaching this conclusion, Prudential stated that Nosko's "examination findings are noted as normal" and that Nosko did "not document decreased motor strength, decreased/absent reflexes, decreased lower extremity/upper extremity/cervical range of motion, decreased grip/grasp, gait/balance issues, observed difficulties getting on/off exam table &/or observed pain issues."  Id. Because the follow-up MRI ordered by Dr. Nosko was not yet available for review, Prudential could not consider the results of that test.  Lastly, Prudential reasoned that Plaintiff's only permanent work restrictions were "no lift/carry w/ push/pull > 30-35 pounds occasionally" and "no frequent neck extension/flexion &/or overhead work."  Id.

    D.      Prudential's Granting of the LTD Application

On the same date Prudential denied Grimes' LTD initial application, Grimes underwent an independent medical examination (IME) by Dr. Jay More, a neurosurgeon, at the request of Horizon.  Def. SOMF at ¶ 35; Pl. Resp. to Def. SOMF at ¶ 35.  In his report, Dr. More noted Grimes' subjective complaints of pain.  <u>See</u> More Patient History/Exam/Consultation/Narrative, Exam Date 02/27/07, PRU 000102-04.  He listed the pain medications she was taking at the time as including, inter alia, "Tylenol with Codeine, Motrin, Naproxen." <u>Id.</u>  The IME report describes the results of Dr. More's physical examination as unremarkable, except "a marked decrease range of motion of the cervical musculature secondary to muscle spasm and pain" and that a "Spurling maneuver embellishes symptoms with flexion extension lateral and rotational movements." <u>Id.</u> at PRU 00103.  The report, further, noted muscle weakness on Plaintiff's right side.  <u>Id.</u>  Additionally, Dr. More reviewed the follow-up MRI ordered by Dr. Nosko and found "no evidence of any neuro-compression with excellent decompression of the disk herniations ...." <u>Id.</u> at PRU 000104.

Dr. More went on to state that he had "no indication to doubt the veracity of [Grimes'] complaints." <u>Id.</u>  He opined that her continued symptoms may have been due to an "instability secondary to incomplete fusion." <u>Id.</u>  He, accordingly, recommended that Grimes undergo: (1) flexion extension cervical x-rays; and (2) a "cervical myelogram with emphasis on flexion and extension views." <u>Id.</u> at PRU 000104-05.  If the x-rays revealed instability, Dr. More opined, such instability would need to be surgically corrected.  <u>Id.</u> at PRU 000105.  If, on the other hand, both the x-rays and the myelogram returned negative, Dr. More stated, "then the patient will have reached maximum medical improvement." <u>Id.</u> at PRU 000105.

In short, while noting that most patients recover successfully from anterior cervical diskectomy and fusion, Dr. More acknowledged that "a small portion of patients . . . for unexplained reasons do not appear to improve." Id. at PRU 000104.  Thus, he concluded, that "it [was] not reasonable to expect [Grimes] to return at the current time to her previous occupational duties."  Id. at PRU 000105.  "Whether she will ever be able to return," he continued, "is dependent upon whether the generator of her current symptoms can be clearly identified and appropriately treated."  Id.

Prudential, upon notification of the IME by Dr. More, "continue[d]" Grimes' application for benefits so that it might consider Dr. More's report.  Prudential Letter dated February 28, 2007, PRU 000398-99.  After Prudential received Dr. More's report, it granted Grimes' application for LTD benefits, effective March 1, 2007.  Prudential Letter dated March 6, 2007, PRU 000395-96.  Grimes' monthly benefit amount was $2,392.00.  Id. at PRU 000395.

Shortly after her benefits were approved, Prudential directed her to apply for social security disability benefits.  Prudential Letter dated May 14, 2007, PRU 000390-91.  Consistent with this directive, Grimes applied and was granted benefits, as described in more detail infra.

E.      Prudential's Denial of Continued Benefits

The day following Prudential's approval of Grimes' LTD application, it directed Michael Chreiten, a vocational rehabilitation counselor, to conduct a paper-based vocational assessment. See Def. SOMF at ¶ 44; Pl. Resp. to Def. SOMF at ¶ 44.  Prudential specifically requested that Mr. Chreiten "review the vocational information available to confirm how the insured's regular occupation would normally be performed instead of how tasks are performed for a specific

9

employer or at a specific location." Prudential Soap Notes dated 3/9/2007, PRU 000293.   In

conducting his review, Mr. Chreiten reviewed the "Occupational Outlook Handbook (2004-05

edition) and a job description for a Horizon policy support specialist."  Id.

> Horizon's job description summarizes the role of a Policy Support Specialist as:
>
>> This position is responsible for the adjudication of complex dental,
>> institutional and/or professional managed claims based upon
>> documentation ....   Determines appropriate cause of action,
>> payment, denial or if further investigation is required.  Operates a
>> personal computer and appropriate software packages or its
>> equivalent.

Horizon Job Description, PRU 000238.  The description, specifically, defines the specialist's

responsibilities as communicating with claimants and internal and external customers, and

"respond[ing] by phone and/or in writing to complex requests for medical policy information ...."

Id.  Core competencies required, according to the description, include "Speed and Agility."  Id. at

PRU 000239.

After reviewing Horizon's job description, Mr. Chreiten found that Grimes' duties "most

closely resembled" those of a claims examiner as defined by the Dictionary of Occupational Titles.

Def. SOMF at ¶ 44; Pl. Resp. to Def. SOMF at ¶ 44.  Mr. Chreiten identified the material duties

of a claim examiner as analyzing and settling insurance claims.  Id.  To complete such work, he

found, a claim examiner compares data, corresponds with agents/claimants, pays amounts due

under the policy, and refers questionable claims to investigators or adjusters.  Def. SOMF at ¶ 45;

Pl. Resp. to Def. SOMF at ¶ 45.  Mr. Chreiten, further, found that claim examiners may interview

claimants, investigate claimants' statements, or investigate in the field.  Id.  In sum, he found that the claims examiner

> occupation requires the ability to lift/carry, push/pull up to 10 pounds occasionally, or negligible amount constantly.  The occupation would typically be performed from a seated position and may involve brief periods of standing and walking.  This position requires frequent reaching, handling, fingering, talking, hearing, and near acuity.

Prudential Soap Notes dated 3/9/2007, PRU 000294.

On May 4, 2007, Prudential wrote to Grimes requesting all treatment records from February 1, 2007 forward.  Prudential Letter dated May 4, 2007, PRU 000392.  According to Prudential, it convened a paper-based, clinical review of Plaintiff's file, in June 2007, by Dr. Jill Fallon.  Def. SOMF at ¶ 39.  By June 22, 2007, Prudential received medical records from Dr. Nosko.  Prudential Letter dated June 22, 2007, PRU 000385.  Per Dr. Fallon's recommendation, by letter dated June 22, 2007, Prudential requested copies of any diagnostic tests performed on Plaintiff, including any flexion extension MRI of the cervical spine, myelogram, neurological evaluations, or pain management treatment/evaluations.  Id. at PRU 000388.

The following month, on July 9, 2007, Prudential requested that Plaintiff submit to an IME by a doctor of its choosing.  See Def. SOMF at ¶ 40; Pl. Resp. to Def. SOMF at ¶ 40.  This IME was performed by Dr. Patrick Foye, a doctor board-certified in Physical Medicine and Rehabilitation, on July 23, 2007.[6]  Def. SOMF at ¶ 41; Pl. Resp. to Def. SOMF at ¶ 41.

---

[6]     The Court notes that Plaintiff did not dispute the July 23, 2007 date denoted in Defendant's Statement of Material Facts at ¶ 41; however, Prudential's correspondence states that the IME was conducted on August 14, 2007.  See Prudential Letter dated September 14, 2007, PRU

In Dr. Foye's report, he describes the following about his examination of Grimes. Importantly, he cites Prudential's notes which state that the myelogram and x-rays ("dynamic films") of the cervical spine were never submitted to Prudential.  Dr. Foye's Report, PRU 000069. He also noted that, according to Grimes, her primary care physician referred her to a psychiatrist for treatment of anxiety and depression.  Id. at PRU 000070.  In terms of symptoms at that time, Dr. Foye recounted them as, inter alia, "neck pain every day, often with referral from her neck up to her head (headaches).  Occasionally, the neck pain repeatedly radiates/travels to the bilateral jaws and shoulders."  Id.

According to Dr. Foye's report, his physical examination of her revealed that her lumbosacral range of motion was decreased to 3/4 the normal range.  Id. at PRU 000074.  T h e report, further, noted "no excessive postural shifts" throughout the 30-minute IME and that she did not need assistance getting on or off the exam table.  Id.  The report noted that, when writing with her right hand, Grimes assisted substantially with her left, and that she did not carry anything with her right hand.  Id.  Tests of her right-hand strength revealed that it was not as strong as her left, according to Dr. Foye's report.  Id. at PRU 000075.  Two "median nerve[s]" in her right-hand fingers showed decreased pinprick sensations.  Id.  at PRU 000076.  Dr. Foye, further, tested her mental capabilities and found her to be within the upper quartile.  Id. at PRU 000078.  Employing the JAMAR grip strength test, Dr. Foye found that her right hand was weaker than the left.  Id. at

---

000377.  Upon reviewing Dr. Foye's report, it is clear that the examination was completed on July 23, 2007 and that it was forwarded to Prudential on August 14, 2007.  See Cover Memo to Dr. Foye's Report, PRU 000068.  Thus, the August 14, 2007 date referenced in Prudential's correspondence is apparently a typographical error.

12

PRU 000079.  Such a result is atypical, the report notes, because Grimes is right-handed; thus, her right hand should have been stronger than her left.  Id.

Based on these findings, Dr. Foye concluded the following: (a) that Grimes did not have any "cervical radiculopathy (although there is the contralateral Spurling's effect, more consistent with pain from scalene muscle stretch, i.e. cervical myofascial pain);" (b) basis for the numbness she experienced at night in her entire upper limb was "unclear;" (c) the physical exam did reveal numbness in her right hand digits and weakness in her right hand; and (d) there was no indication of cognitive impairment.  Id. at PRU 000081, PRU 000083.  Dr. Foye recommended electrodiagnostic testing ("EMG/nerve studies") to uncover the source of her numbness and weakness symptoms.  Id.  He, further, recommended "following through" on the "dynamic x-rays of the cervical spine and/or a cervical/myelogram."  Id.  In terms of her functional capacity, Dr. Foye opined that she could lift no more than twenty (20) pounds.  Id. at PRU 000082.  More significantly, he opined that "[s]he may also have difficulty with continuous tasks . . . such as . . . typing and/or writing throughout the workday."  Id.  Accordingly, he suggested, "she may benefit from voice recognition software . . . to help minimize the need for typing/writing."  Id. at PRU 000082-83.

Considering Mr. Chreiten's vocational assessment, and Dr. Foye's IME report, Prudential concluded that Grimes was no longer entitled to disability benefits on September 14, 2007.  Prudential Letter dated September 14, 2007, PRU 000378.  Prudential cited, in its letter, Dr. Foye's conclusion that Grimes could not lift over 20 pounds, or even 5 pounds with her right hand and, more significantly, that she "may also have difficulty with continuous . . . typing/writing

throughout the workday." Id. Prudential then cited Mr. Chreiten's definition of Grimes' occupation's material duties as lifting "up to 10 pounds occasionally, or negligible amount constantly" and "frequent reaching, handling, fingering, talking, hearing, and near acuity." Comparing these two findings, Prudential "determined that [Grimes did] not continue to meet the definition of disability [under the Plan]." Id. Prudential did not specifically address the typing/writing restrictions in its letter.

       F.     Grimes' Appeals

          1.     The October 2007 Appeal

Grimes appealed Prudential's denial of continued LTD benefits by letter dated October 10, 2007. Def. SOMF at ¶ 47; Pl. Resp. to Def. SOMF at ¶ 47. In the October 10th letter, Plaintiff's then-counsel, Richard D. Brown, Esq., recounted Grimes' physical symptoms and stated that "[h]er physical condition has had a strong emotional impact on her, leaving her clinically depressed." Brown Letter dated October 10, 2007, PRU 000089. Along with medical records already in Prudential's possession, Grimes attached to the appeal letter the results from an MRI of the Lumbosacral Spine with Extension dated August 16, 2007. Id. The August 16, 2007 MRI indicated "[s]light to mild lumbar stenosis L4-L5 secondary to a degenerative anterior spondylolisthesis." Triat Radiology Letter dated August 17, 2007, PRU 000101.

Also attached to Grimes' appeal letter was a letter from Dr. Nosko dated July 2, 2007. The letter from Dr. Nosko noted that Grimes was examined on that date. Dr. Nosko Letter dated July 2, 2007, PRU 000095. Dr. Nosko noted that Grimes continued to complain of pain, which he "believe[d] was neuropathic in nature." Id. He noted her limited range of motion and diminished

sensation in her hands for "slight touch and pin prick in the C6-C7 distributions." <u>Id.</u>   "This is causing her problems with respect to grasp and retention," his report stated.  <u>Id.</u>  In his view, no additional testing needed to be conducted.  "An EMG [wa]s unlikely to be helpful . . . and [f]lexion extension films [were] also unnecessary . . . given the fine cut CT scan of the area."[7] <u>Id.</u>

In sum, Dr. Nosko opined that he did "not think that Ms. Grimes [wa]s going to see any significant improvement."  <u>Id.</u>  At that time, he thought that Grimes "may still show some signs of improvement over the next 2 to 3 months," but he was nonetheless "becoming less optimistic" about her recovery.  <u>Id.</u>  Dr. Nosko stated that he did not see a role for additional surgery and he suspected that Grimes would be required to go on disability because she was unable to work in her condition.  <u>Id.</u>

In addition to the MRI films, Dr. Nosko's letter, and the previously-submitted records, Grimes' submitted notes from her psychiatrist, Dr. Chowdhury F. Azam, M.D., in support of her appeal.  Dr. Azam Notes dated 07/30/07, PRU 000096.  Dr. Azam noted that Grimes had been taking Cymbalta, by way of prescription by her primary care physician, for two months, but that she was continuing to experience anxiety and depression.  <u>Id.</u>  According to his notes, Grimes was "[f]eeling depressed, disappointed as a result of the surgery . . . [f]eels things are falling apart."  <u>Id.</u>  Dr. Azam increased her dosage of Cymbalta and added Xanax.  <u>Id.</u>  No other testing was requested.

---

[7]      Neither party has pointed the Court to the CT scan referenced by Dr. Nosko in the July 2nd letter.

Lastly, Grimes' appeal letter requested documentation from Prudential including, inter alia, materials considered in reviewing her claim.  Id.  Once that documentation was received, the letter stated, Grimes' counsel would "supplement the appeal should that be necessary or appropriate." Id.  On November 2, 2007, Prudential sent a letter to Grimes' counsel noting that supporting documentation had not yet been received and advised that it would proceed to review her claim on March 13, 2008 if the documentation was not received by that date.  Prudential Letter dated November 2, 2007, PRU 000375.

On December 4, 2007, Grimes supplemented her appeal letter.  In the supplemental letter, Grimes' attorney advised Prudential that she had been awarded social security benefits and that she was receiving benefits under a privately purchased disability policy from MetLife.  Def. SOMF at ¶ 48; Pl. Resp. to Def. SOMF at ¶ 48.  Regarding Plaintiff's symptoms, the supplemental letter stated that she continued to suffer from limited motion in her neck and that she was unable to sit or stand for even short periods of time.  Id.  Additionally, the supplemental letter argued that Dr. Foye's report was biased and that Prudential's reliance on a generalized description of Plaintiff's occupation was inappropriate.  Id.

That next month, on January 8, 2007, Prudential requested a second, paper-based, independent file review by Dr. Erik Beck, a physician specializing in Physical Medicine and Rehabilitation/Pain Management.  Def. SOMF at ¶ 50; Pl. Resp. to Def. SOMF at ¶ 50.  The physician considered Grimes' surgery records, surgery follow-up records, Dr. Foye's IME, and the August 17, 2007 MRI.  Prudential Letter dated January 31, 2008, PRU 000369.  In describing the records, Dr. Beck notes that Grimes "has had ongoing complaints of neck and right arm pain with

16

weakness in the right hand." <u>Id.</u>  Dr. Beck mentioned the objective findings of right-hand weakness and finger sensation difficulties found in Dr. Foye's IME report.  <u>See id.</u> He, further, opined that Grimes' subjective complaints of pain were supported "in part" by physical examination findings and diagnostic testing.  Beck Independent Peer Review dated January 24, 2008, PRU 000136.

Based on Dr. Beck's reading of Grimes' medical records, he concluded that she had sedentary work capacity with weight restrictions of occasionally lifting or carrying up to 10 pounds and frequently lifting up to 5 pounds.  <u>Id.</u>  He, further, concluded that there was no restriction relating to "sitting/standing/walking."  <u>Id.</u>  He, lastly, recommended electrodiagnostic testing to further assess the cause of her symptoms.  Beck Independent Peer Review dated January 24, 2008, PRU 000129.

On January 31, 2008, Prudential denied Grimes' October 2007 appeal.  <u>Id.</u>  Prudential relied primarily upon Dr. Beck's file review to support its denial decision.  It quoted a protion of Dr. Beck's report that noted, inter ali, Grimes' medical records revealed a decreased range of motion and mild lumbar stenosis in her lower spine.  <u>Id.</u>  Prudential did not specifically address whether Plaintiff was limited with respect to "continuous tasks . . . such as . . . typing and/or writing throughout the workday" as stated in Dr. Foye's IME report.  Its letter did note; however, that Dr. Beck found Grimes' right upper extremity weakness only "equivocally" supported by strength testing.   <u>Id.</u> at PRU 000370.  Ultimately, Prudential concluded that Dr. Beck's report demonstrated that Grimes was not disabled under the Plan because she could complete the material duties of claims examiner within the weight restrictions he proposed.  <u>See id.</u>  In this

regard, Prudential also relied on the report of its vocational expert.  Id.  Again, Prudential did not specifically address any typing or writing restrictions.  Lastly, the letter advised Grimes that she could appeal, a second time, for a final decision by Prudential on her claim.

 2. The June 2008 Appeal

Plaintiff filed a second appeal by letter dated June 17, 2008.  In this appeal letter, Grimes pointed to Prudential's failure to address, in its January 31, 2008 denial letter, her right-hand weakness and (in)ability to type continuously throughout the workday.  Brown Letter dated June 17, 2008, PRU 000149.  This appeal also challenged Prudential's reliance on the Dictionary of Occupational Titles to define Grimes' occupation, as opposed to her actual job description.  Id. at PRU 000150 n.1; Def. SOMF at ¶ 53; Pl. Resp. to Def. SOMF at ¶ 53.  In further support of this appeal, the medical records of Dr. Joseph Riggi, Dr. Nosko, Dr. Merken, Dr. Gan, and Dr. Buchwald were attached.  Brown Letter dated June 17, 2008, PRU 000152; Def. SOMF at ¶ 54; Pl. Resp. to Def. SOMF at ¶ 54.

It is important to note that the records of Drs. Merken, Gan, and Buchwald, which related to Plaintiff's right hand numbness, were created prior to her 2006 surgery.  See Brown Letter dated June 17, 2008, PRU 000152.  Because those records do not relate to Plaintiff's medical status at the time of Prudential's benefit decision, the Court does not recount those records.  Dr. Riggi's and Dr. Nosko's records, by contrast, were created after Grimes' surgery.  See id.  Dr. Nosko's notes had been previously provided to Prudential; thus the Court need describe only Dr. Riggi's notes here.

According to Dr. Riggi's notes, he first saw Plaintiff on February 11, 2008.  Dr. Riggi's Notes dated February 11, 2008, PRU 000154.  In terms of his physical examination of Plaintiff, he noted "decreased flexion, decreased extension, decreased rotation, decreased left lateral bending and decreased right lateral bending" in addition to atrophy in the right forearm.  Id. at PRU 000155.  Her right wrist muscle "Strength/tone" was noted as decreased.  Id.  Dr. Riggi concluded, in his notes, that Grimes suffered from cervical root injury and dysthymic disorder.  Id.

Dr. Riggi's notes from a follow-up visit on April 4, 2008 reiterated his prior diagnosis.  Dr. Riggi's Notes dated April 8, 2008, PRU 000157.  At that time, Dr. Riggi added additional diagnoses based on Grimes' complaints of new constitutional, respiratory, and gastrointestinal symptoms.  Id. at PRU 000156-57.  These diagnoses included, inter alia, malaise/fatigue and hyperlipidemia.  Id. at PRU 000157.  His physical examination revealed no new data.  See id.

Following receipt of Plaintiff's June 17, 2008 appeal letter, and accompanying documentation, Prudential requested a paper-based, independent peer review by Dr. Stuart Shipko, a doctor board-certified in Psychiatry and Neurology, on October 10, 2008.  Def. SOMF at ¶ 55; Pl. Resp. to Def. SOMF at ¶ 55.  The primary purpose of this review was to address Dr. Riggi's diagnosis of dysthymic disorder, a psychiatric illness.  Id.  After reviewing Plaintiff's medical records, Dr. Shipko concluded that her records indicated only a "mild degree of illness" that was treatable with medication.  Dr. Shipko Independent Peer Review dated October 10, 2008, PRU 000170.  He based his conclusion on Grimes "infrequent visits" and that her medications were "relatively static," indicating that the medications were successful in treating her "mild longstanding depressive disorder."  Id. at PRU 000170-71.  In light of these conclusions, Dr. Shipko opined that

19

Grimes was not functionally impaired due to dysthmyic disorder or any other depressive condition. Id. at PRU 000169.

Around the same time it requested Dr. Shipko's peer review, Prudential requested, on October 1, 2008, that Dr. Beck provide an addendum to his January 2007 paper-based, peer review.[8]  See Def. SOMF at ¶ 57; Pl. Resp. to Def. SOMF at ¶ 57.  For preparing this addendum, Dr. Beck was provided with copies of all post-January 2007 medical records.  Def. SOMF at ¶ 58; Pl. Resp. to Def. SOMF at ¶ 58.  After reviewing the supplemental records, Dr. Beck concluded that the documentation "d[id] not alter his prior assessment."  Id.

On October 30, 2008, Prudential issued its final decision, upholding its termination of Grimes' benefits.  Prudential, specifically, relied upon the reports of Dr. Beck, Dr. Shipko, and the prior vocational assessment in concluding that Grimes was not disabled.  Def. SOMF at ¶ 59; Pl. Resp. to Def. SOMF at ¶ 59; Prudential Letter dated October 30, 2008, PRU 000358-60.  While recognizing that her records demonstrated that she suffered from "weakness in her [right] wrist flexors" and that "the restrictions of occasional fingering, punching, and gripping with the upper right extremity . . . remain," this denial still did not address whether these restrictions affected Grimes' ability to type at work.  Prudential Letter dated October 30, 2008, PRU 000359.  In reliance on Dr. Shipko's analysis, Prudential concluded that Grimes was not functionally limited

---

[8]     While Defendant's Statement of Material Facts states that Prudential requested the addendum from Dr. Beck on "October 1, 2009," it is clear from the chronology that this is a typographic error.  Given that Dr. Beck issued his addendum on October 15, 2008, the Court finds that the Prudential requested the addendum on October 1, 2008.

on account of any depressive condition.  In sum, Prudential concluded that Grimes was able to perform the material and substantial duties of her occupation.  Id.

G.      Social Security Benefits

As noted, Plaintiff applied for social security benefits per Prudential's directive.  Plaintiff's social security disability benefit application was granted effective December 2007.   Def. SOMF at ¶ 49; Pl. Resp. to Def. SOMF at ¶ 49.  Her monthly benefit was $1,651.00.  Id.

H.      Procedural History

After Prudential issued its final decision on October 30, 2008, Plaintiff brought the instant action, in the Superior Court of New Jersey, Somerset County, on December 23, 2008. Defendant removed to this Court on January 28, 2009 and discovery ensued.  While her complaint does not designate specific counts, the complaint asserts, inter alia, New Jersey Consumer Fraud Act, "violation of the ERISA statute," and "fraud based on the wrongful denial of disability benefits" claims. Compl., ¶ 2.  On November 12, 2009, the parties executed a Consent Order dismissing Plaintiff's breach of contract, bad faith breach of the implied covenant of good faith and fair dealing, and fraud claims as preempted by ERISA.  Defendant then filed its motion for summary judgment on November 13, 2009, seeking affirmance of its decision to terminate benefits and dismissal of Plaintiff's only remaining state law claim—the New Jersey Consumer Fraud act claim.  Plaintiff filed her motion for summary judgment that same day, seeking reversal of Prudential's termination decision.  The Court now rules on both motions.

III.    DISCUSSION

A.      Summary Judgment Standard

21

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed.R.Civ.P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party ...." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements...'" Trap Rock Indus., Inc. v. Local 825,

22

Int'l Union of Operating Eng'rs., 982 F.2d 884, 890 (3d Cir.1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991)).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial ...."  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  Credibility determinations, however, are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

      B.      ERISA Standard of Review

      The Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115.   Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be dismissed if reasonable."  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d. Cir. 1997) (quoting Firestone, 489 U.S. at 111).  In other words, when a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard.  See Stoetzner v. United States Steel Corp., 897 F.2d 115, 119 (3d. Cir 1990) (application of deferential arbitrary standard of review appropriate when

benefit plan gives administrator discretionary authority to determine eligibility); see also Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991) (held the same).

However, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115; see Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004). A conflict of interest can be created, for example, when an employer both funds and evaluates employee claims. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008). A conflict of interest can also be created if an employer "pay[s] an independent insurance company to fund, interpret and administer a plan. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000) overruled on other grounds by Glenn, 128 S.Ct. at 2350. However, a conflict of interest is not present if an employer funds a benefits plan, but an independent third party is paid to administer the plan. Pinto, 214 F.3d at 383; see also Kao v. Aetna Life Ins. Co., 647 F.Supp.2d 397, 420 (D.N.J. 2009). Additionally, if an employer establishes a plan and creates an internal benefits committee vested with the discretion to interpret the plan and administer benefits, a conflict of interest is not found. Pinto, 214 F.3d at 383; see also Post v. Hartford Ins. Co., 501 F.3d 154, 164 n. 6 (3d Cir. 2007) overruled on other grounds by Estate of Kevin Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009).

Recently, the Supreme Court in Glenn altered the way in which a conflict of interest is handled by the courts. 128 S.Ct. at 2350. In light of Glenn, the Third Circuit abandoned its "sliding scale" approach to ascertain the amount of discretion afforded decisions of plan administrators. Schwing, 562 F.3d at 525-26. Post-Glenn, the governing standard requires the

plaintiff to show that the denial of benefits was arbitrary and capricious, with a conflict of interest as simply one factor for the court's consideration.  Id. at 526.

A plan administrator's decision is arbitrary and capricious if "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993); Kao, 647 F.Supp.2d at 410. "This scope of review is narrow, and the Court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."  Abnathya, 2 F.3d at 45.  Although the arbitrary and capricious standard is extremely deferential, "[i]t is not ... without some teeth."  Moskalski v. Bayer Corp., 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008).  "Deferential review is not no review, and deference need not be abject."  Id.  (citation omitted).  Substantial evidence requires more than a "mere scintilla" of evidence." Id. at *4 n. 3 (citation omitted).

While some cases refer to the governing standard as abuse of discretion, the Third Circuit has "recognized that, at least in the ERISA context, [the abuse of discretion and arbitrary and capricious] standards of review are practically identical."  Estate of Schwing, at 526 n.2 (citing Abnathya, 2 F.3d at 45 n.4); Kao, 647 F.Supp.2d at 410, n.19. Hence, I may use the terms "abuse of discretion" and "arbitrary and capricious" interchangeably in this opinion.

The Plan here is both issued and administered by Prudential.  See Def. Open. Br. at 3-4. According to the terms of the Plan,

> Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

LTD Plan at 40.  Thus, in light of Prudential's dual role as both insurer and administrator, the court may consider this inherent structural conflict of interest as one factor in determining whether the administrator's decision was arbitrary and capricious.  Glenn, 128 S.Ct. at 2349 (holding that where an insurance company serves as plan administrator there exists a conflict of interest).

The weight to be accorded this structural conflict is another matter.  The conflict may "act as a tiebreaker when the other factors are closely balanced," and its importance will increase "where circumstances suggest a higher likelihood that it affected the benefits decision ...."  Id. at 2351.  Conflicts are most pertinent, for example, "where an insurance company administrator has a history of biased claims administration," id., or where an insurer fails to provide its independent experts with all relevant evidence upon which to base their reports.  Id. at 2352.  Grimes makes several arguments as to how the conflict should be weighed here.  I will address these arguments infra in connection with my review of the administrator's decision.

C.      Discussion

Both Plaintiff's and Defendant's motions for summary judgment primarily address whether Prudential's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious.   In addition, Defendant seeks judgment on Plaintiff's consumer fraud claim, arguing that is preempted by ERISA, and also seeks an offset against the benefits paid under the Prudential policy for disability benefits Plaintiff received from social security.  Plaintiff concedes that those social security benefits received during the same time that she was receiving benefits under the Prudential policy may be used to offset the Prudential benefits.  See Pl. Reply Br. at 10.  I address, first, Prudential's decision to terminate benefits.

1.      Prudential's Termination of Benefits

Grimes argues that Prudential's decision to terminate her benefits is not supported by the record.  In her view, that she is disabled "is amply supported by the multiple reports of her treating physician along with the IME's prepared for Prudential."  Pl. Open. Br. at 6.  She, specifically, argues that Dr. Nosko, Dr. More, and Dr. Beck each concluded that she had several permanent functional limitations and that Prudential "produced no medical evidence to rebut the above doctors' medical conclusions."  Id. at 9.  In addition, Plaintiff points to the Social Security Administration's approval of her disability application under the more stringent "any occupation" rules, as evidence that Prudential's decision was arbitrary and capricious.  In the same manner, she points to MetLife's approval of her disability claim in support of her contention.

Ultimately, the central issue to both motions for summary judgment is whether Prudential reasonably concluded, in light of the medical evidence, that Grimes was not disabled under the Plan.  As noted, the Plan defines disability as the inability to "perform the material and substantial duties of your regular occupation." LTD Plan at 10.  "Material and substantial duties" are defined as those duties "normally required for the performance of your regular occupation."  Id.; id. at 34.  "Regular occupation" is defined as the "occupation you are routinely performing when your disability occurs."  Id. at 35.  Importantly, the Plan goes on to permit Prudential to "look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location."  Id. (emphasis added).

My review of the record reveals that the records of Drs. Nosko, Dr. More, and Dr. Beck each substantiate that Grimes is functionally limited in terms of weight restrictions and her ability to

engage in continuous typing throughout the day.  While Plaintiff intimates in her briefing that her depressive conditions caused functional limitations, she has pointed to no objective medical evidence in the record to support that contention other than her primary care physician's prescription for Cymbalta and Dr. Azam's notes.  Prudential properly relied upon Dr. Shipko's peer-review in concluding that those records indicated only a "mild degree of illness" based on her infrequent visits and relatively static medications.  Dr. Shipko did not contradict the findings of Plaintiff's treating physicians, but only concluded that Plaintiff suffered no functional limitations as a result of her mild depressive condition.   Accord Burk v. Broadspire Services, Inc., 342 Fed.Appx. 732, 737-738 (3d Cir. 2009).

The weight restrictions are also not problematic for Prudential.  The lightest weight restriction was suggested by Dr. Beck in his IME report, in which he opined that Grimes could lift five (5) pounds regularly and ten (10) pounds only occasionally.   Under the Dictionary of Occupation Titles' generalized claim examiner position, an examiner may occasionally be required to "lift/carry, push/pull up to 10 pounds . . . or [a] negligible amount constantly."  Prudential Soap Notes dated 3/9/2007, PRU 000294.  Thus, Prudential reasonably concluded that Grimes was not precluded, by her weight limitation, from performing this aspect of her Regular Occupation.

A more difficult question is presented, however, by the evidence suggesting that Plaintiff is limited in continuous typing.  The Dictionary of Occupational Titles provides that the claim examiner position "requires frequent reaching, handling, fingering, talking, hearing, and near acuity."  Prudential Soap Notes dated 3/9/2007, PRU 000294 (emphasis added).  The claim examiner position, further, must "correspond with agents/claimants."  Id.  It is not clear from the

record what is meant by "fingering," and Prudential did not address in any of its letters whether such "fingering" would include typing.  And it is not clear whether correspondence with agents/claimants is primarily oral or written.  Certainly, Horizon's job description specifically requires typing but Prudential was correct to exclude Horizon's description from its analysis in light of the Plan's definition of Regular Occupation.  <u>See</u> LTD Plan at 35 (in defining "Regular Occupation," stating that "Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer ....").

What troubles me is that the record is devoid of evidence that Prudential duly considered Grimes' documented typing limitation.  The doctor it retained to perform an IME review, Dr. Beck, acknowledged this limitation in his report.  <u>See</u> Def. Opp. Br. at 14 (acknowledging "fingering" limitation in Dr. Beck's report).  And, Prudential even noted the existence of Grimes' right-hand weakness and numbness issues in its October 30, 2008 final denial letter.  Prudential was surely aware of Plaintiff's argument that this evidence made clear that she could not type, as she expressly made that argument in her June 2008 appeal.  Without any explanation from Prudential, it is difficult to imagine why this functional limitation was not expressly compared to the claim examiner duties.  Thus, in my view, Prudential's failure to address Grimes' typing-related functional limitation warrants remand for Prudential to consider whether that medical evidence alters its benefits determination decision.

That remand is warranted is supported by the structural conflict of interest present here. Where an administrator is also the insurer under a plan, courts have held that a structural conflict of interest may exist.  <u>Baker v. The Hartford Life Ins. Co.</u>, 2010 WL 2179150, *13 (D.N.J. May

28, 2010).   To demonstrate that a causal connection exists, the plaintiff must point to a link

between the administrator's conflict and its benefits determination.   In the Supreme Court's ruling

in Glenn,

> this causal connection was established when the administrator
> encouraged the claimant to apply for Social Security Disability
> benefits in order to off-set its financial burdens, but after the
> claimant applied for and was granted SSD benefits, the
> administrator ignored the Social Security Administration's findings
> and denied claimant's application for LTD by finding that she was
> not disabled, thus benefitting financially at both ends.

Baker, (discussing Glenn, 128 S.Ct. at 2351-52).   Similarly, here, Prudential is both administrator

and insurer under the Plan.   Prudential, like the administrator in Glenn, directed Grimes to apply

for social security benefits and then granted no weight to the Social Security Administration's

disability determination.   While this factor alone would not likely justify remand, see Marciniak v.

Prudential Financial Ins. Co. of America, 184 Fed. Appx. 266, 269 (3d Cir. 2006) (holding that an

award of social security benefits "may be considered as a factor in evaluating whether a plan

administrator has acted arbitrarily and capriciously in reviewing a plaintiff's claim[; [h]owever, a

Social Security award does not in itself indicate that an administrator's decision was arbitrary and

capricious ...."),[9] combined with Prudential's outright failure to consider Plaintiff's typing limitation,

it further tips the scale in favor of that result here.

_____

[9]     Prudential's citation to O'Connell v. Unum Provident, 2006 WL 288080, *12 (D.N.J.
Feb. 6, 2006), for the proposition that a Social Security Administration determination is of "little value"
in assessing an insured's ERISA claim, predates the Third Circuit's decision in Marciniak v. Prudential
Financial Ins. Co. of America, 184 Fed. Appx. 266, 269 (3d Cir. 2006), issued on June 21, 2006.
Accordingly, Prudential's reliance on O'Connell is misplaced.

As I explained recently in <u>Dunn v. Reed Group, Inc.</u>, remand is appropriate where the plan administrator has failed to make adequate findings or adequately explain the grounds of its decision.  2009 WL 2848662, *19 (D.N.J. Sept. 2, 2009) (citations omitted).  In light of this Court's discretion in selecting a remedy, and its preference to afford Prudential the opportunity to address Plaintiff's typing limitation in the first instance, it finds that the facts weigh in favor of remand rather than reinstatement of LTD benefits.  <u>Accord</u> <u>Syed v. Hercules Inc.</u>, 214 F.3d 155, 162 (3d Cir. 2000) (stating "the remedy for a violation of § 503 [of ERISA] is to remand to the plan administrator so the claimant gets the benefit of a full and fair review").  Only after these findings are made by Prudential can the Court make an adequate assessment of whether Prudential's denial was arbitrary and capricious.  Accordingly, in light of the Court's decision to remand, it need not reach Plaintiff's argument that its MetLife policy determination should have been considered by Prudential.  Nor need the Court rule upon Defendant's request to offset Plaintiff's social security benefits against the Prudential benefits paid.

  2.  Preemption

As noted, the parties previously executed a Consent Order dismissing Plaintiff's breach of contract, bad faith breach of the implied covenant of good faith and fair dealing, and fraud claims as preempted by ERISA.  Now, Prudential argues that Grimes' consumer fraud claim is preempted by ERISA, citing to <u>Beye v. Horizon Blue Cross Blue Shield of New Jersey</u>, 568 F.Supp.2d 556, 570 (D.N.J. 2008), <u>Wayne Surgical Center, LLC v. Concentra Preferred Systems, Inc.</u>, 2007 WL 2416428, *5 (D.N.J. Aug. 20, 2007), and <u>D'Alessandro v. Hartford Life and Accident Ins. Co.</u>, 2009 WL 1228452, *3 (D.N.J. May 1, 2009).  Plaintiff responds by challenging

the precedential value of these opinions, and by citing Lemelledo v. Beneficial Management Corp., 150 N.J. 255 (1977) and Weiss v. First Unum Life Ins. Co., 482 F.3d 254 (3d Cir. 2007).

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). According to the Supreme Court, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Aetna Health, Inc. v. Davila, 542 U.S. 200, 209 (2004). The Third Circuit has recognized an exception to ERISA preemption for those claims challenging the quality of the medical treatment performed as opposed to cases where the claim challenges the administration of, or eligibility for, benefits. Pryzbowksi v. U.S. Healthcare, Inc., 245 F.3d 266, 273 (3d Cir.2001). Additionally, claims of previously-paid health benefits qualify as claims for "benefits due" and, thus, are also not preempted by ERISA. See Levine v. United Healthcare Corp., 402 F.3d 156 (3d Cir. 2005). Otherwise put, where the plaintiff's claim rests on an independent legal duty, not arising from the ERISA Plan, the claim may be brought. Davila, 542 U.S. at 212-13.

Plaintiff is correct that there is no binding case law in this circuit, holding that this broadly construed preemption provision bars state consumer fraud law claims. In Beve, as Plaintiff argues, one of the plaintiffs voluntarily dismissed her New Jersey Consumer Fraud Act claim in the face of a preemption challenge. 568 F.Supp.2d at 567. However, contrary to Plaintiff's assertion, another plaintiff in that case did not so concede and the Court reached the merits of the preemption argument. In terms of Wayne Surgical Center and D'Alessandro, Plaintiff is correct that they are both unpublished decisions. Notably, D'Alessandro relies solely on Wayne Surgical Center and

Beye in support of its holding.  D'Alessandro, 2009 WL 1228452 at *3.  That court engages in no preemption analysis with respect to consumer fraud claims in particular.  See id.

The Court acknowledges Plaintiff's citation to Lemelledo v. Beneficial Management Corp. and Weiss v. First Unum Life Ins. Co., but these cases are unhelpful to her.  Lemelledo addresses whether New Jersey Consumer Fraud Act claims may be brought against credit insurers for commercial lenders, see Lemelledo, 150 N.J. at 548, and Weiss addresses whether the McCarran-Ferguson Act preempts state RICO claims.  482 F.3d at 258.  Indeed, in Weiss, the Third Circuit noted that the district court had dismissed the plaintiff's consumer fraud act claim as preempted by ERISA, but that ruling was not appealed.  Id. at 257.  Hence, the Weiss Court did not address ERISA preemption of that claim.  Id.  These precedents, therefore, do not shed light on the preemption issue.

Courts outside this circuit, however, have held that ERISA preempts state consumer fraud statute claims.  For example, the Second Circuit in Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 114 (2d Cir. 2008) held that ERISA preempted claims brought under the Connecticut Unfair Trade Practices Act.  That court reasoned that the unfair trade practices claim was "premised on [inter alia] the . . . denial of benefits under th[e] Plan; [made] explicit reference to the Plan; and . . . require[d] reference to the Plan in the calculation of any recovery."  Id. Consequently, that court concluded that the unfair trade practices claim related to a covered plan and was preempted by ERISA.  Id.  This case was actually cited by Beye in support of its holding that a host of state law claims (albeit not a consumer fraud-based one) were preempted by ERISA. 568 F.Supp.2d at 570.

33

Likewise, I conclude that Grimes' New Jersey Consumer Fraud Act claim is preempted by ERISA. Plaintiff alleges in her complaint that Prudential committed a fraud by wrongfully denying her benefits, Complaint at ¶ 2. In her motion papers, she characterizes her claim as follows: "Prudential embarked on an unconscionable commercial practice and scheme to defraud and deceive long-term disability benefit holders by knowingly deny [sic] a claim that it should pay." Pl. Reply Br. at 2. She, further, characterizes her claim as asserting that "Prudential represented that it would pay a benefit if the insured became disabled, but Prudential, through bad faith practices, never intended to pay ...." Id. at 2-3. Just like the unfair trade practices claim in Paneccasio, Plaintiff's consumer fraud claim here is premised on the alleged wrongful denial of benefits under the Plan, makes reference to the Plan, and would require reference to the Plan to calculate recovery if Plaintiff proved successful. Accord Luppino v. Sedgwick Claims Mgmt Svcs., 2010 WL 1999316, *8 (D.N.J. May 19, 2010) (holding that state law claims are preempted where they "involve[ ] the recovery of benefits due under the terms of a plan, the enforcement of rights under a plan or the clarification of the right to future benefits under the plan."). Moreover, Plaintiff has not cited to any independent legal duty to support her claim. Accordingly, I conclude that Plaintiff's New Jersey Consumer Fraud Act claim is preempted by ERISA.

## IV.   CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment is DENIED IN PART as to Plaintiff's ERISA claim. Defendant's motion is GRANTED IN PART as to Plaintiff's New Jersey Consumer Fraud Act claim. Plaintiff's motion for summary judgment is GRANTED to the

extent that the Court remands this case for further administrative review.  Accordingly, this CASE

IS CLOSED.


Dated: June 29, 2010                                    /s/ Freda L. Wolfson
                                                        Freda L. Wolfson, U.S.D.J.